Island Creek Coal Company v. Commissioner.
Island Creek Coal Co. v. Commissioner
Docket No. 1286-65.
United States Tax Court
T.C. Memo 1966-103; 1966 Tax Ct. Memo LEXIS 178; 25 T.C.M. (CCH) 540; T.C.M. (RIA) 66103; May 23, 1966
*178 David B. Buerger, 1800 Oliver Bldg., Pittsburgh, Pa., and William Y. Rodewald, for the petitioner. John J. Larkin, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined income tax deficiencies against petitioner, for the taxable years 1959 and 1960 in the respective amounts of $227,271.37 and $63,802.02. Petitioner disputes them and claims refunds for each year in the respective amounts of $70,230 and $59,331. In its petition (paragraphs h through p) the petitioner alleged that, in determining its deduction for depletion of its coal mines, its general and administrative expenses and mine overhead expenses should be allocated to each mineral interest in proportion to the direct expense of each interest. In paragraph 5 of the stipulation of facts this issue is conceded by the respondent. The only issue presented for decision is whether the amount of $10,000,000 paid by petitioner in 1959 to Guyan Eagle Coal Company and Elk Creek Coal Company was properly included in petitioner's basis for depreciation of tangible properties. Findings of Fact Some of the facts were stipulated by the parties and are hereby found *179 accordingly. Island Creek Coal Company (herein called either Island Creek or petitioner) is a Maine corporation having its principal office at Huntington, West Virginia. It filed its Federal corporation income tax returns for the taxable years 1959 and 1960 with the district director of internal revenue at Parkersburg, West Virginia. For many years the petitioner has been engaged in the business of mining, preparing, and selling bituminous coal, with its operations centered in numerous coal mines in southern West Virginia. One of its neighbors in this region was Guyan Eagle Coal Company which, with its subsidiary Elk Creek Coal Company, operated five mines. As to the three Guyan Eagle mines, the coal was owned by a Guyan Eagle subsidiary, Kelly-Hatfield Land Company, and leased to Guyan Eagle at a royalty of 15 cents per ton. As to the two Elk Creek mines, the coal was owned by two unrelated lessors and leased to Elk Creek at a royalty of 10 cents per ton. With respect to all the mines, Guyan Eagle and Elk Creek owned all the tangible properties necessary to mine coal, consisting of mining machinery and equipment, electrical equipment, mine cars, track, pipe, buildings, office *180 equipment, and preparation plants. After several months of arm's-length negotiations, the petitioner on January 31, 1959, entered into an agreement with Guyan Eagle and Elk Creek by which they transferred the tangible properties to petitioner for $10,000,000. At the same time the petitioner assumed the obligations of Guyan Eagle and Elk Creek under certain coal leases and sales contracts, paying $500 for the coal leases and $1 for the sales contracts. On February 1, 1959, the petitioner entered into an agreement with Kelly-Hatfield Land Company by which it leased the Kelly-Hatfield coal at the same royalty of 15 cents per ton, but obtained several minor favorable changes from the lease formerly in effect between Guyan Eagle and Kelly-Hatfield. Also at the same time the petitioner obtained the required consents to the assignments from the two lessors of the Elk Creek coal, being obliged in one case to agree to an increase in the royalty from 10 cents to 12 1/2 cents per ton. In his notice of deficiency dated December 17, 1964, the respondent determined that the purchase price was allocable as follows: Depreciable assets
$6,427,220
Mineral leases
3,160,053
Sales contracts, etc.
358,320
*181 Therefore, respondent disallowed depreciation on the $3,160,053 and $358,320. In its belief that the tangible property was worth more than the $10,000,000 purchase price for the going coal mining operations of Guyan Eagle and Elk Creek, the petitioner was willing to pay royalties for the coal higher than it believed the coal was worth. Petitioner's real estate manager and its vice president were familiar with the terms of almost every coal lease in the region. Petitioner had been a party to the majority of such leases and kept abreast of the terms of the other leases by studying the public records. In view of the relative qualities of the coal involved and all the other leases, the Guyan Eagle coal was worth no more than the 15 cents per ton royalty which petitioner agreed to pay for the Kelly-Hatfield coal. Although the Elk Creek coal was of a higher metallurgical grade, the Elk Creek mines were relatively expensive to operate and involved costly haulage. Consequently, the Elk Creek coal was worth no more that the 10 cents and 12 1/2 cents per ton royalties which petitioner agreed to pay. Since the coal so leased to petitioner was worth no more than the obligations petitioner assumed *182 as lessee, the leases had no value. At the time of the acquisition one of the Elk Creek mines was under contract to deliver to a United States Steel plant at Cleveland its requirements of metallurgical coal. This contract had been producing a profit for Elk Creek at the contract price of $6.25 per ton. In October 1958 United States Steel had renegotiated the contract to reduce the price to $5.50 per ton, which was not enough to provide a profit. This sales contract had no value to petitioner. Guyan Eagle and Elk Creek had no other sales contracts. While Guyan Eagle and Elk Creek sold coal under the names of its mines, this was done merely for identification and had no value in attracting customers. Island Creek did not acquire any right to the Guyan Eagle and Elk Creek sales organization. Only a few of its salesmen actually came with petitioner. Substantially all of the Guyan Eagle and Elk Creek customers were large industries and utilities who desired to have several sources of supply for their coal. Since petitioner had previously been selling to many of the same customers, the acquisition of the mines did not give it any substantial number of new customers whose business it *183 could thereby hold. At the time of the acquisition the petitioner gave careful consideration to the question of whether the Guyan Eagle and Elk Creek businesses had any goodwill. Their earnings for the preceding 7 years had averaged about $900,000, but this was largely due to abnormally high earnings in 1956 and 1957 resulting from shipments of coal to Europe on account of the Suez crisis. The 1958 earnings were about $400,000 and, at the time of the acquisition, the trend and expected future of both sales and earnings were downward. Petitioner hoped and expected to improve the earnings through its more skilled management. There were insufficient earnings to establish any goodwill in the Guyan Eagle and Elk Creek businesses. The fair market value of all the tangible properties, i.e., the machinery and equipment, mine cars, electrical equipment and lines, track, trolley and pipe, buildings and structures, and coal preparation plants, was not less than $10,000,000 as of January 31, 1959. Ultimate Findings Petitioner paid $10,000,000 solely for tangible properties. The intangible assets acquired by petitioner had no value. Opinion There is no disagreement between the parties *184 as to the total cost of the Guyan Eagle and Elk Creek assets acquired by petitioner for a consideration of $10,000,000. The purchase price was fairly bargained for through arm's-length negotiations and it represents the full value of the assets acquired. Thus the only dispute relates to the allocation of the purchase price between the tangible and intangible assets. Respondent takes the position that of the $10,000,000 paid by Island Creek the amount of $3,160,053 was in reality paid for the coal leases and $358,320 was paid for sales contracts and other intangible assets. Petitioner, on the other hand, contends that the real meaning of the agreement of January 31, 1959, was exactly what it said, viz., that the tangible properties were worth at least the full $10,000,000; that the leases had no value in excess of the royalties required to be paid; and that the sales contracts and other intangible assets had no value. What the fair market value of the tangible properties was on January 31, 1959, is, of course, entirely a question of fact. The largest items of value in the tangible properties were the coal preparation plants. These are large aggregations of buildings and machinery *185 designed to receive raw coal from the mines, clean it and remove impurities, crush it and sort it into different sizes, and load it in freight cars on various railroad tracks. Petitioner presented convincing testimony of three competent mining engineers who had appraised the plants for it in 1958 when it was considering the acquisition. Their opinion was that the coal preparation plants then had a fair market value of about $7,500,000. These appraisals were made by itemizing and valuing each of the pieces of machinery in the plants. Against these appraisals the respondent offered three types of testimony. The first was an estimate of what could be obtained for the plants if they were to be dismantled and sold off piecemeal. Although we agree that the petitioner would not have bought the coal preparation plants if there had been no coal, the fair market value of the plants should not be determined by their value as scrap. The second type of evidence was a calculation based on the book values of the plants in the hands of Guyan Eagle and Elk Creek. The evidence, however, showed the books to be inaccurate. Therefore, we have not accepted the book values, particularly where witnesses *186 on both sides agreed that substantial capital items had been expensed rather than capitalized and hence did not in fact appear on the books. The final effort of the respondent was to appraise hypothetical coal preparation plants of similar capacity but having different equipment. Since petitioner had permitted full examination of the plants by respondent's agents and expert witnesses and had furnished them with accurate detailed lists of the actual machinery, we regard the evaluation of the hypothetical plant as having no probative value. [1]
The parties disagreed as to the proper method of computing the expected lives and hence the 1959 value of the preparation plants, after their reproduction costs had been established. Petitioner's witnesses testified that, with normal maintenance, the plants would last as long as the coal reserves, estimated at 40 years, and supported this testimony with examples of over 30 similar preparation plants still in use after such time. Respondent's *187 witnesses testified that coal preparation plants had a life of only 17 years, but offered no support for their generalization by citing any specific instance. Moreover, petitioner showed that even though its plants were approaching or had passed what would be the end of their useful life on respondent's theory, the plants were still in active use and only minimum replacements were required. We accept the petitioner's method as correct. Petitioner likewise presented persuasive testimony of its department managers and of a highly qualified used machinery dealer as to the reproduction cost and of the used value of the other tangible properties acquired. The total of the used value so established was about $5,500,000. Respondent's witnesses accepted the accuracy of the testimony as to description of the property, condition, and reproduction cost. However, one of respondent's expert witnesses, a used machinery dealer, then appraised the property at slightly over $3,000,000 on the basis of the mines being closed and the property dismantled rather than on its value in use of the coal mines. This appraisal not only excluded the cost of installing property such as rail track and power lines *188 in the mines, but also sought to deduct the cost of removing them plus a large profit for the used machinery dealer. Such a scrap value appraisal cannot establish fair market value. The testimony of petitioner's witnesses stands unrefuted. While we might marshal and discuss at length the evidence introduced by both sides, it is our view that such an effort would serve no useful purpose. Extended discussions of the testimony and documentary evidence, pro and con, terminating in a conclusion that is based in the last analysis upon a subjective judgment about the weight of the various materials considered, often given merely the illusion of a process of reasoning, when in fact the result reached is simply the trial court's ultimate findings on the record as a whole. See (C.A. 2, 1943) and (C.A. 2, 1953). We think it will suffice for us to say that we have carefully considered all the evidence presented and all relevant facts. In doing so, we are satisfied that the petitioner has carried its burden of proof by the fair preponderance of the evidence. Accordingly, we have concluded *189 and found as a fact that the tangible properties which Island Creek acquired from Guyan Eagle and Elk Creek had a cost basis to Island Creek equal to the full amount paid. Although the petitioner's opinion evidence tends to show a value of about $13,000,000 for the tangible assets as against the respondent's evidence of a minimum value of around $7,500,000, it is not necessary in view of our ultimate finding of fact for us to determine the amount, if any, by which the value of the tangible properties might exceed the purchase price of $10,000,000. We need only find, as we have done, that their value was not less than $10,000,000. We have also concluded from the evidence that the coal leases had no cost to petitioner over and above the royalties which were to be paid to the lessors if, as, and when the coal was mined and that the sales contracts and other intangible assets had no value. To reflect the decision reached herein and to provide for the adjustments required by respondent's concession of the depletion issue. Decision will be entered under Rule 50. Footnotes
1. Even respondent's expert witnesses stated that the present replacement cost of the coal preparation plants was approximately $6,900,000 and that the replacement cost less depreciation was $4,400,000.↩